```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
```

```
_____
                                )
UNITED STATES OF AMERICA,       )
                                )
    v.                          ) Crim. Action No. 07cr10280-NG
                                )
CHRISTOPHER JONES,              )
    Defendant.                  )
```
GERTNER, D.J.

## MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS
### December 11, 2008

Christopher Jones ("Jones" or "the defendant") has been indicted on a single count: being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He has moved to suppress evidence obtained from his stop and arrest on June 19, 2007.

The search in question took place in the early morning hours of June 19, 2007, near Cataloni's Bar ("Cataloni's") in Dorchester, Massachusetts. The facts regarding the search are heavily contested, but after a hearing I conclude that the testimony supports the facts as they are testified to by the three officers who participated in the search. The motion to suppress (docket #26) is DENIED.

I.  **DEFENDANT'S VERSION**

According to Jones, who testified at the suppression hearing,[1] he arrived at Cataloni's around 11:00 p.m. on June 18,

---

[1] In addition to defendant, Cori William Lewis and Lamont Jenkins testified. Neither observed the critical facts on which the officers' testimony was based.

2007.  He had a drink and played pool.  After a time, he went outside to smoke a cigarette, standing in the exit doorway of the bar, marked on the street as 12 Hancock Street.  Other customers were also in the area.  Jones saw an unmarked police car turn onto Hancock Street and park near the bar.  He finished his cigarette and walked from 12 Hancock Street to 10 Hancock Street, the entrance doorway, to re-enter the bar.  Jones was wearing a tall tee-shirt and pants, held up by a belt.

As Jones entered the bar, he testified that he was grabbed from behind by the police for no reason and pulled back to the patrol car by the back of the belt.  He then put his hands on the hood of the patrol car.  An officer pushed his head forcefully to the hood.  When he turned his head to ask the police officer why, the officer took a swing at his head.  Around this time, another officer pulled his tee-shirt off over his head.  Jones backed away to avoid the physical confrontation, but the police tackled him and beat him in the back of the head, face, and nose.  Jones yelled for help, but nobody came to his aid.  He required medical treatment for his injuries.

II. GOVERNMENT'S VERSION

The police's story is wholly different.  Trooper Thomas Duane ("Duane"), and Officer Brian Smigielski ("Smigielski") testified that they were on patrol during the evening of June 18,

2007, along with Trooper Walter Baiardi ("Baiardi").  They were assigned to an unmarked car and were not in uniform, but each wore a badge around his neck.

At 11:45 p.m. on June 18, 2007, Smigielski received a call in his car from his supervisor, Sergeant John Fitzgerald ("Fitzgerald").  Fitzgerald indicated that he had received information from a confidential informant.  The informant told Fitzgerald that he or she was in Cataloni's bar, that he or she had felt the gun as the defendant walked past inside Cataloni's.  The informant described the man in question as a black male with corn-rolled hair, wearing black "Dickies" pants, a white tee-shirt, a red bracelet, and having multiple tattoos on his arms.  Fitzgerald credited that information even though he had only known the informant for a week.  During that week the witness had given Fitzgerald information that had led to an arrest for crack cocaine and firearm possession.  Fitzgerald told Smigielski the officers were to "stop him [the individual identified by the informant] and conduct a threshold inquiry, check him for firearms."

Meanwhile, the patrol officers -- Duane, Smigielski, and Baiardi -- drove to Cataloni's.  They saw a man standing in the doorway who precisely matched the description that had been given

over the radio. They radioed Fitzgerald for further instructions.

Fitzgerald told Smigielski the officers were to "stop him [the individual identified by the informant] and conduct a threshold inquiry, check him for firearms."[2] Fitzgerald continued to monitor the situation on the radio.

As the police pulled up to the curb in front of the bar, Duane made eye contact with the man. Jones moved his hands to his waistband "to make a check of his waistband." According to Duane, that movement was characteristic of a person carrying an unholstered gun in his waistband.

Duane and Baiardi got out of the car and approached Jones. While they were not in uniform, their badges were prominently displayed. Duane asked if he could speak to Jones. Jones did not reply to the officers but said something to the bar customers in the area, and tried to reenter the bar. Baiardi "reached in" towards Jones and met resistance from the other customers, as well as Jones who "straight armed" him. Jones complied briefly with the officers, walking towards the patrol car. He then pushed Duane out of the way and attempted to flee. Baiardi grabbed Jones' tee-shirt to slow him down and followed him.

---

[2] According to the testimony, officers were instructed that they can conduct a threshold inquiry of a person suspected of carrying a gun and inquire if the person has a license.

As Jones fled, Duane observed that he appeared to be trying to retrieve something from his waistband. Duane yelled a warning, as did Smigielski. Working together, the three officers wrestled Jones to the ground as he resisted their efforts to get him under control. Smigielski admitted that he "hit Jones several times in an effort to get him to submit and to keep him away from the gun." As the officers tried to subdue Jones, Jones yelled to the crowd to help him.

Duane was concerned by Jones' plea because Jones' gun was lying on the ground between the crowd and the officers. He drew his gun and went quickly toward the crowd, which backed away.

Fitzgerald, who had been listening to the encounter on the radio, heard Smigielski's cry for help and drove to the scene. He found Jones on the ground, the officers trying to get him into handcuffs, with a firearm to the side of him and a red bracelet which matched the bracelet the informant had described. (Fitzgerald also recognized the informant in the crowd that had gathered around Jones). Backup units arrived to assist with Jones' arrest.

III. <u>LEGAL STANDARDS</u>

The threshold question is whether <u>Terry v. Ohio</u>, 392 U.S. 1, (1968) justified the initial police encounter with Jones. I conclude that given the information that the officer had --

Fitzgerald's very concrete tip, which identified defendant, the observations of the three officers, including the observation that defendant was checking what could be a gun in his waistband -- there was reasonable suspicion justifying a Terry stop. Specifically, they had a reason to question him concerning the gun and whether he had a license to carry. And Jones' reaction to that inquiry, running away, violently struggling for the gun, clearly provided probable cause to arrest.

To be sure, there may well be a question about where the Terry stop ended and an arrest began. When the officers initially approached Jones, he turned to reenter the bar and said something to the customers outside. Rather than allowing Jones to leave, however, Baiardi reached in and grabbed his arm and asked him to take a walk with the police. The officers agreed that, at that point, Jones was not "free to leave."

The line between Terry stop and arrest is a fact-intensive one. It necessarily involves an evaluation of whether the measures taken in detaining the suspect can, under the circumstances, be reconciled with the limited nature of a Terry stop or whether the arrest-like features of the stop, such as forcible restraint or lengthy detention, make the detention tantamount to an arrest. United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998). Inquiries undertaken pursuant to a Terry

stop must be reasonably related in scope to the justification for their initiation. United States v. Ogden, 703 F.2d 629, 634 (1st Cir. 1987) (internal citations omitted); United States v. Sharpe, 470 U.S. 675 (1985). Terry, after all, represented only a limited exception to the Fourth Amendment's probable cause rule.

I am persuaded that the brief period of time from the initial encounter at the door to the bar, through the period when Baiardi grabbed Jones' arm, up until the point at which Jones fled was part and parcel of a single and reasonable investigative stop. The site was out side a crowded bar; the officers wanted to know if Jones had a weapon and a license to carry it. When Jones seemed to be enlisting other customers to help him, it was reasonable to take him to a place, the patrol car, where further inquiry could be safely conducted.

After Jones' flight and his effort to reach for the gun, there was probable cause to arrest him. In assessing probable cause where an informant is involved, the Court must simply analyze whether, under a totality of the circumstances, probable cause existed. See Illinois v. Gates, 462 U.S. 213, 230 (1983). Information pertaining to the informant's veracity, reliability, and basis of knowledge are all pertinent. Id. The informant's veracity is supported by the detailed description given of Jones, including the red bracelet that the police officers saw and

seized as evidence.  Reliability is suggested by the fact that the informant had previously supplied information, including a description of clothing, leading to a valid arrest and a drug trafficking charge.  On the other hand, reliability is diminished by the fact that the informant had only given one previous tip to the police.  Finally, the informant stated his or her basis of knowledge for the gun -- that he or she had "felt the gun when [Jones] walked past" inside Cataloni's.

Two other pieces of information also suggest probable cause to believe Jones not only had a gun but that he was ready to use it.  The first is whether Jones made an adjustment to his belt or waist area when the officers first observed him.  The defendant argues that one might adjust one's belt or waist area for any number of innocent reasons.  Even if the action could have more than one interpretation, in this context the officers' interpretation was reasonable.  The second is Jones' flight, while apparently reaching for a weapon.  See, e.g., Illinois v. Wardlow, 528 U.S. 119, 125 (2000).

For all the above reasons, defendant Jones' Motion to Suppress Evidence (document #26) is DENIED.


SO ORDERED.

Date:  December 11, 2008                /s/ Nancy Gertner

**NANCY GERTNER, U.S.D.C.**

**NANCY GERTNER, U.S.D.C.**